UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present: Judges Beales, O'Brien and Malveaux
Argued by videoconference


JAMES CLYDE GORDON

v.     Record No. 1284-19-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE MARY BENNETT MALVEAUX
NOVEMBER 17, 2020


FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
David B. Carson, Judge Designate

Brandon S. Baker (Brandon S. Baker, PLLC, on brief), for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


James Clyde Gordon ("appellant") was convicted of two counts of taking indecent

liberties with a child, in violation of Code § 18.2-370; three counts of aggravated sexual battery,

in violation of Code § 18.2-67.3; sodomy, in violation of Code § 18.2-67.1; and object sexual

penetration, in violation of Code § 18.2-67.2. During his pre-trial detention for those offenses,

appellant was convicted of possession of a deadly weapon by a prisoner, in violation of Code

§ 53.1-203; attempt to escape from jail by force or violence, in violation of Code § 18.2-478; and

three counts of obstruction of justice, in violation of Code § 18.2-460(C). On appeal, appellant

argues that the trial court erred in finding the evidence sufficient to convict him of the

obstruction charges. He further argues that the trial court abused its discretion when it sustained

the Commonwealth's objection to his cross-examination of a witness. For the following reasons,

we affirm.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

I.  BACKGROUND

"On appeal, we review the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court."  Nelson v. Commonwealth, 71 Va. App. 397, 400 (2020) (quoting Vasquez v. Commonwealth, 291 Va. 232, 236 (2016)).  So viewed, the evidence is as follows.

The Jailhouse Offenses and Appellant's First Trial

Upon complaints by appellant's sister-in-law, R.M., a minor, appellant was arrested for a number of sex offenses.  Pending trial, he was held in the Rockbridge Regional Jail.

Eldridge Mays testified that he lived in the same jail "pod" as appellant from January to June 2018.  Appellant told Mays about his plan to break out of jail.  Although Mays initially thought that appellant was joking, he realized over time that appellant was serious about his plan.  Mays testified that appellant had sharpened two spoons to create "shank[s]" and explained to him how he planned to incapacitate the guards and escape.  Appellant also told Mays that after he escaped, he would pick up a "survival pack" prepared by his wife.  Appellant then planned to abduct R.M. and flee to West Virginia, where he would sell R.M. to people he knew would "have fun with her."  Mays stated that appellant said of R.M., "she thinks I . . . [had sex with] her before.  She ain't seen nothing till on the way to West Virginia."

Appellant explained to Mays that he planned to physically harm certain people after he escaped but before he fled the area.  Appellant's intended victims included a Commonwealth's attorney, a judge, and two investigators with the Rockbridge County Sheriff's Office, Andrew Ehrhard and Travis Patterson, who were investigating the sex offenses alleged by R.M.

Mays testified that appellant had written "letters" in which he described himself as lightning and told Investigators Ehrhard and Patterson that they "wouldn't know when he was

going to strike." Appellant's writings indicated that he would "eventually get [the investigators] but he would start with their families first." The writings also referred to guns and explosives.

After appellant set a date for his escape, Mays requested to speak with the investigators about appellant's plan. Investigator Ehrhard interviewed Mays. Based upon the information Mays provided, police searched appellant's cell.

Investigator Joshua Berry of the Rockbridge County Sheriff's Office participated in the search. Berry testified that two sharpened plastic utensils were found in appellant's cell, along with numerous handwritten documents including supply lists, maps of various locations, and letters, some of which were labelled as numbered clues. The writings contained various statements, including

> Anderw And Traivs . . . I be under your nose for 2 or 3 weeks when someone find's this so you mite look over your shoulder or your love one's close BC I know where yall . . . live and the next time I see yall it will not be good . . . . There will not be a next time For you Anderw to kick me in the back . . . . you will pay for that . . . and Traivs will see how it feels to look down a gun . . . .
> * * * *
> If you are the one readin this you will never understand how I feel about someon tellin lies on me . . . I will not be locked up for something that I did no do so if you or someone you know or family I mite be havin someone whitchin them or I mite be whitchin them myself . . . . I am like lightin you will never know when I will strike you or someone you love . . . . whitch over your shoulder if you are against me BC I might be whitchin you look for me. Anderw and Travis . . . I know where yall live . . . . . Just rember to look over your shoulder all the <u>time</u> whitchin you! And your day is comin soon
> * * * *
> rose's are red lier is a peace of shit just like Anderw and Traivs is . . . . I mite be under your ride LOL
> * * * *
> People whitchin everone that done me <u>wrong</u> so check on your family first Anderw Travis . . . and others
> * * * *
> If you done me wrong that you will be dealt with . . . . And you will never know when. it will be <u>SO</u> <u>if</u> <u>you</u> <u>done</u> <u>me</u> <u>wrong</u> you mite keep lookin over your shoulder . . . . And I will be whitchin you and family's

Based upon the items found in appellant's cell, investigators obtained a search warrant for appellant's home. There, they found letters from appellant to his wife that had been mailed from the jail and which referenced appellant's plans to escape. Investigators also found backpacks containing various items, including boxes of instant macaroni and cheese, cooking oil, shampoo, a hatchet, and a camping stove.

After conducting their searches, investigators interviewed appellant. Investigator Berry testified that appellant initially denied he had been planning an escape. Asked about the backpacks, appellant said that they contained items he intended to be sold to fund his commissary account. Later in the interview, however, appellant told the investigators that he wanted the backpacks to be dropped off where he could "pick them up and use them to survive after escaping."

The investigators also asked appellant about the writings found in his cell, which Berry testified had been "intended to be left behind for investigators to discover." Appellant initially claimed to have been "writing to get [his] anger out." However, he also told investigators that the writings were "a diversion to buy himself time to get to . . . West Virginia" and that "a lot of the threats were used to cause law enforcement to have to focus on themselves." When asked if his plan upon escaping was to retaliate, appellant stated that "karma['s] a bitch" and "whatever happens[,] happens." Appellant indicated that he was upset because he had been accused of lying in the case involving R.M.

Appellant was indicted for possession of a deadly weapon by a prisoner, in violation of Code § 53.1-203; attempt to escape from jail by force or violence, in violation of Code

§ 18.2-478; and three counts of obstruction of justice with respect to R.M., Investigator Ehrhard, and Investigator Patterson, in violation of Code § 18.2-460(C).[1]

During appellant's jury trial, the Commonwealth introduced the writings found in appellant's cell. Mays testified that he had seen appellant produce some of the writings and specifically denied seeing anyone else produce them. Asked about appellant's use of the word "clue," Mays testified that appellant had told him "he'd leave [the writings] around his [cell] so . . . it would be different clues for . . . them to find."

The Commonwealth also introduced recordings of appellant's jailhouse telephone calls. In a conversation with his mother, appellant discussed the sex offense charges brought against him and stated, "I don't need to get out to have somethin' done, I can call somebody and have somethin' done to the little bitch." When appellant's mother cautioned him, "[n]ow, don't start that," appellant replied, "I don't care if they're listenin' or not. I mean, one damn lie . . . and she's done messed up my life."

After the Commonwealth concluded its case-in-chief, appellant moved to strike the evidence with respect to the obstruction charges. He argued that the evidence was insufficient to prove that he knowingly attempted to intimidate or impede the threatened parties. The trial court denied the motion.

Appellant then testified on his own behalf. He acknowledged creating some of the writings that were found in his cell but denied creating others. Appellant testified that he never did anything to communicate threats to Investigators Patterson and Ehrhard.

---

[1] Appellant was also indicted for obstruction of justice with respect to the Commonwealth's attorney, in violation of Code § 18.2-460(C), and threatening the abduction of R.M. with intent to defile, in violation of Code § 18.2-49. Appellant was found not guilty of those offenses.

During cross-examination, appellant agreed that his jailhouse writings were "just writing [his] thoughts out" as instructed by his anger management counselor. He further agreed that the "clues" and other writings found in his cell were diversionary items to "buy [him] time to get to West Virginia."

Appellant renewed his motion to strike, and the trial court denied the motion. The jury convicted appellant.

Appellant's Subsequent Trial for Sex Offenses

During appellant's jury trial for the offenses committed against R.M., Mays testified about inculpatory statements made by appellant. On direct examination, Mays acknowledged that he was a convicted felon facing pending criminal charges and that he had been released on bond with the agreement of the Commonwealth. However, he denied receiving "any consideration from the Commonwealth" or "anything for [his] testimony" in appellant's trial.

During cross-examination, counsel for appellant asked Mays about the nature of his pending charges. When counsel asked Mays, "is it correct that what you were in jail for . . . [,]" the Commonwealth objected "to the relevance of [Mays'] charges other than that he has them." After a colloquy held outside the presence of the jury and the court reporter, the trial court sustained the objection.

Later, outside the presence of the jury, the trial court conducted an on-the-record bench conference to memorialize the parties' objections to some of its evidentiary rulings. Counsel for appellant argued that he should have been permitted to cross-examine Mays about the nature of his pending charges because Mays' testimony would have been relevant to show his "intent to attempt to reduce and/or work off his drug charges." Counsel further argued that "it is relevant . . . if he had been instructed that he could not give [investigators] any additional drug

defendants and to go back and obtain additional information from [appellant]." The court restated its prior ruling.

The jury convicted appellant, and this appeal followed.

## II.  ANALYSIS

### A.  Sufficiency of the Evidence

Appellant argues that the trial court erred in finding the evidence sufficient to convict him of the obstruction of justice offenses.[2]

"In determining whether the evidence was sufficient to support a criminal conviction, the appellate court views the evidence in the 'light most favorable' to the Commonwealth" and "defers to the trial court's findings of fact unless they are plainly wrong or without evidence to support them." Green v. Commonwealth, 72 Va. App. 193, 200 (2020).  "This deferential standard 'requires us to "discard the evidence of the accused in conflict with that of the Commonwealth[] and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn"' from that evidence." Williams v. Commonwealth, 71 Va. App. 462, 483-84 (2020) (alteration in original) (quoting Vasquez, 291 Va. at 236).  "This standard 'applies not only to the historical facts themselves, but [also to] the inferences from those facts.'" Green, 72 Va. App. at 200 (alteration in original) (quoting Clanton v. Commonwealth, 53 Va. App. 561, 566 (2009) (*en banc*)).  Viewing the evidence and inferences in this light, "[t]he relevant issue on appeal is . . . 'whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Lambert v. Commonwealth, __ Va. __, __ (Apr. 9, 2020) (quoting Pijor v. Commonwealth, 294 Va. 502,

---

[2] Appellant assigns three errors to the trial court with respect to his obstruction convictions—one each pertaining to the obstruction of R.M., Investigator Ehrhard, and Investigator Patterson.  On brief, he presents a single argument addressing all three convictions.  Accordingly, we resolve appellant's first three assignments of error through a single analysis.

512 (2017)).  Thus, the trial court's judgment will not be reversed unless it is plainly wrong or without evidentiary support.  Murray v. Commonwealth, 71 Va. App. 449, 460 (2020); see also Code § 8.01-680.

Appellant argues that without a showing that he attempted to send his threats to Ehrhard, Patterson, and R.M., the Commonwealth failed to prove that he had the requisite intent to intimidate or impede them.  He asserts that he "took no action to communicate his threats to them.  [He] did not send any of the letters to them.  [He] did not ask anyone on the cell block to relay his threats."  Further, appellant contends, there was no evidence that he had any reasonable expectation of his threats being relayed to R.M., Patterson, and Ehrhard.

Code § 18.2-460(C) provides, in pertinent part, that

> [i]f any person by threats of bodily harm or force knowingly attempts to intimidate or impede a . . . witness, [or] any law-enforcement officer, lawfully engaged in the discharge of his duty, or to obstruct or impede the administration of justice in any court . . . relating to the violation of . . . any violent felony offense listed in subsection C of [Code] § 17.1-805, he is guilty of a Class 5 felony.[3]

"The plain language of [the statute] provides that *threats* constitute a violation of the statute when they are knowingly made in an attempt to intimidate or impede."  Polk v. Commonwealth, 4 Va. App. 590, 593 (1987) (interpreting then-subsection A of Code § 18.2-460).[4]  The offense "does not require the defendant to commit 'an actual or technical assault,'" Craddock v.

---

[3] Code § 17.1-805(C) enumerates, among other offenses, those sex offenses for which appellant was awaiting trial when he was indicted and tried for obstruction.

[4] The language of then-subsection A of Code § 18.2-460, as interpreted in Polk, is substantially similar to the relevant language of present-subsection C at issue here.  See 1984 Va. Acts ch. 571 (providing, in pertinent part, that under then-subsection A of Code § 18.2-460, "[i]f any person, by threats, or force, knowingly attempts to intimidate or impede a . . . witness, or any law-enforcement officer, lawfully engaged in his duties as such, or to obstruct or impede the administration of justice . . . , he shall be deemed to be guilty of a Class 1 misdemeanor").  Thus, while the Court in Polk interpreted a different subsection of the statute, its holding on the requisite elements of obstruction of justice is instructive and guides our analysis.

Commonwealth, 40 Va. App. 539, 552 (2007) (quoting Love v. Commonwealth, 212 Va. 492, 494 (1971)), and "words alone can support a conviction for obstruction of justice, [when] those words . . . contain some manner of a threat intended to intimidate" the person at issue, Brown v. City of Danville, 44 Va. App. 586, 597 (2004) (citation omitted). Therefore, "[i]t is the threats made by the offender, coupled with his intent, that constitute the offense. The resulting effect of the offender's threats . . . is not an element of the crime," and thus "[t]he offense is complete when the attempt to intimidate is made." Polk, 4 Va. App. at 593-94.

"Intent is a factual determination, and a trial court's decision on the question of intent is accorded great deference on appeal and will not be reversed unless clearly erroneous." Towler v. Commonwealth, 59 Va. App. 284, 297 (2011). "A defendant's intent, due to its very nature, 'may, and often must, be inferred from the facts and circumstances in [the] particular case.' Circumstantial evidence is treated in the same manner as direct evidence. It 'is as competent and is entitled to as much weight.'" Parham v. Commonwealth, 64 Va. App. 560, 566 (2015) (alteration in original) (citations omitted) (first quoting Ridley v. Commonwealth, 219 Va. 834, 836 (1979); then quoting Chambliss v. Commonwealth, 62 Va. App. 459, 465 (2013)). "In determining intent, the fact finder is entitled to draw inferences from proven facts, so long as the inferences are reasonable and justified." Towler, 59 Va. App. at 297 (quoting Siquina v. Commonwealth, 28 Va. App. 694, 700 (1998)).

We find appellant's argument unpersuasive and hold that sufficient evidence supports his convictions for obstruction of justice. The evidence at trial for the jailhouse offenses, including appellant's statements to investigators and Mays and his own testimony, showed that appellant devised a plan to escape from jail and flee to West Virginia. The evidence further demonstrated that part of appellant's plan was to prepare writings that he would leave behind in his cell— writings that would be found upon his escape and would serve as diversions to aid his flight.

When the authorities searched appellant's cell prior to his planned escape, they found a number of written documents. Mays testified that he had seen appellant compose some of those documents and that he had seen no one else compose them, and appellant admitted writing some of them. Included in appellant's writings were numerous threats, together with statements indicating that after appellant had escaped, he would linger in the area long enough to carry out those threats.

Specifically, appellant threatened Investigators Ehrhard and Patterson that he knew where they lived, that their "day [was] comin soon," that they should "look over [their] shoulder[s] or [their] love one's," and that "I am like lightin you will never know when I will strike you or someone you love." Additional threats were directed at those appellant accused of "[t]ellin lies on me." The writings stated that "rose's are red lier is a peace of shit," "[p]eople whitchin everyone that done me <u>wrong</u>," "[i]f you done me wrong that you will be dealt with," and "you will never know when. It will be <u>SO</u> <u>if</u> <u>you</u> <u>done</u> <u>me</u> <u>wrong</u> you mite keep lookin over your shoulder."

From these threats, together with appellant's plan for how they would be received and the response they would provoke, the jury could reasonably infer that appellant intended his threatening writings to intimidate or impede Investigators Ehrhard and Patterson and the witness, R.M., whom appellant accused of lying about him to police. Thus, the trial court did not err in finding the evidence sufficient to convict appellant of obstruction of justice with respect to R.M., Investigator Patterson, and Investigator Ehrhard.[5]

---

[5] Appellant testified at trial that his written documents were "just writing [his] thoughts out" as an anger-management technique directed by a counselor. However, it was within the province of the jury, as fact-finder, to determine appellant's credibility as a witness and to disregard his testimony as a self-serving attempt to conceal his guilt. <u>Raspberry v. Commonwealth</u>, 71 Va. App. 19, 29 (2019); <u>Reed v. Commonwealth</u>, 62 Va. App. 270, 282 (2013).

B.  Relevance Objection

Appellant argues that the trial court erred during his trial for the sex offenses when it sustained the Commonwealth's relevance objection to his cross-examination of Mays.  He contends that he was entitled to reveal any reasons that May might have had to be untruthful. Specifically, appellant argues that the jury should have been allowed to hear Mays' testimony about the potential sentence he was facing, which would have facilitated appellant's efforts to impeach Mays by asking him about plea deals or "bargains for leniency."  Thus, appellant contends, the trial court abused its discretion when it did not allow him to "lay the foundation" for any such deals or bargains.

We are unable to reach the merits of appellant's argument, because appellant made no proffer of the testimony he expected to elicit from Mays.  "When . . . an objection is sustained and a party's evidence is ruled inadmissible . . . , 'the party must proffer or avouch the evidence for the record in order to preserve the ruling for appeal; otherwise, the appellate court has no basis to decide whether the evidence was admissible.'"  Lockhart v. Commonwealth, 34 Va. App. 329, 340 (2001) (quoting Smith v. Hylton, 14 Va. App. 354, 357-58 (1992)); see also Va. R. Evid. 2:103(b).  "[T]he range of content required" for a proper proffer "depend[s], in part, on the proffer's purpose," but it must be sufficiently detailed "to allow the appellate court to determine whether the trial court erred in excluding the evidence and, if so, whether that error was harmless."  Creamer v. Commonwealth, 64 Va. App. 185, 195 (2015).

Here, during the on-the-record bench conference at trial, appellant represented that he should have been allowed to question Mays about the nature of his pending charges to show Mays' "intent to attempt to reduce and/or work off his drug charges."  Appellant further stated that such questioning would be relevant "if [Mays] had been instructed that he could not give [investigators] any additional drug defendants and to go back and obtain additional information

- 11 -

from [appellant]." Appellant did not proffer what he expected Mays to testify regarding: the charges and potential punishment he was facing; his intent in cooperating with the authorities; his instructions from investigators, beyond those to which he had already testified; or any inducements allegedly offered to him by the Commonwealth. Thus, the record lacks a proper proffer of the testimony appellant had planned to elicit from Mays if permitted to cross-examine him further. Without such a proffer in the record, this Court lacks a basis for determining whether the trial court erred in sustaining the Commonwealth's relevance objection and prohibiting further cross-examination.

### III. CONCLUSION

For the foregoing reasons, we conclude that the trial court did not err in finding the evidence sufficient to convict appellant for each of the three counts of obstruction of justice. We further conclude that appellant failed to make a proffer sufficient for this Court to determine whether the trial court erred in sustaining the Commonwealth's objection to his cross-examination of a witness. Accordingly, we affirm.

<u>Affirmed.</u>